**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) **CRIMINAL ACTION** |
| | ) |
| v. | ) No. 12-10089 |
| | ) |
| GONZALO RAMIREZ and PEDRO GARCIA, | ) |
| | ) |
| Defendants. | ) |

---

<u>**MEMORANDUM AND ORDER**</u>

This case comes before the court on defendants Gonzalo Ramirez'
and Pedro Garcia's motions for a new trial. (Docs. 912, 914, 938,
1005). The motions have been fully briefed. (Docs. 926, 934, 935,
936, 958, 971, 1019). The court held an evidentiary hearing on March
31, 2014. The motions are denied for the reasons herein.[1]

**I.    Facts and Procedural History**

On April 16, 2012, the grand jury returned a 38-count indictment
against 23 defendants, including Ramirez and Garcia. All defendants
were alleged to be members of a criminal organization, the Nortenos
gang, which engaged in narcotics distribution and acts of violence
involving murder and robbery committed in Dodge City, Kansas. Both
Ramirez and Garcia were charged in count 1 with being participants in
the overall RICO conspiracy in violation of 18 U.S.C. § 1962(d).

Ramirez and Garcia also were charged with VICAR offenses in
counts 2 through 5, 7, and 8. Counts 2 and 3 charged them with
conspiracy to murder and the murder of Israel Peralta. Counts 4 and

---

[1] Pedro Garcia's motions to join Ramirez' motions are granted.
(Docs. 940, 1013, 1014).

5 charged them with attempted murder and assault with a dangerous weapon upon Mariano Sorano, Faustino Peralta and Roberto Arco. Counts 7 and 8 charged them with assault with a dangerous weapon upon Isidro Raleas-Velasquez and conspiracy to commit an assault. Both Ramirez and Garcia were also charged with violations of 18 U.S.C. § 924(c) in counts 6 and 9. The allegations concerning counts 2 through 9 occurred on June 8, 2009.

Ramirez was additionally charged with VICAR offenses in counts 10 through 12. These charges stemmed from an incident which occurred on October 4, 2008. Ramirez was charged with conspiracy to murder, attempted murder and assault with a dangerous weapon. Count 13 charged Ramirez with a violation of 18 U.S.C. § 924(c).

The court began the jury trial in this case on October 2, 2014.[2] The trial lasted ten days and evidence was presented through 39 witnesses.

### A. Testimony at Trial

The government presented several witnesses who testified about the Nortenos gang in Dodge City, Kansas. In addition, two eye witnesses, co-defendants Russell Worthey and Anthony Wright, testified concerning the events of June 8, 2009, the murder of Israel Peralta. Defendants' motions focus on the testimony of Worthey and the government's failure to disclose impeaching information. Because the pertinent cases go into detail regarding the evidence, this court will do so, as well.

---

[2] Garcia and Ramirez were the only defendants to proceed to trial. The remaining defendants, with the exception of Adam Flores who was dismissed, entered guilty pleas.

### Russell Worthey

Worthey testified about the Nortenos gang and identified defendants as members of the gang.[3] Worthey related how an individual becomes a member of the gang, its street signs, its symbols and their meanings, and the rival gangs. Worthey explained that the gang had regular meetings and he collected fees from the members which were used to purchase guns and drugs as well as to support members who were incarcerated.

On June 8, 2009, Wright picked up Worthey and they drove to Garcia's house. Wright and Worthey later left the house with Garcia and Ramirez. Wright drove past the trailer park on McArtor Street. Wright stated that some Surenos, the rival gang, lived in a certain trailer. The four observed a group of people standing outside drinking. Garcia said "we're going to get these mother fuckers." (Tr. at 606). Wright parked up the street and they got out of the car and walked up behind the trailer where the four individuals were drinking. Garcia and Ramirez covered their faces with bandanas. Worthey saw Ramirez pull out a revolver and Garcia yelled "Norte." (Tr. at 615). Worthey started running after he saw Ramirez with the gun. Worthey did not see Garcia with a gun but he heard two bursts of gunfire while he was running away from the trailer. Worthey was later picked up by Wright in the car. Garcia and Ramirez were already in the car when Worthey was picked up. While in the car, Garcia said "I got that one, I got him." (Tr. at 621). Garcia then told Wright and Worthey "to keep [their] mouths shut because [they] all got kids."

---

[3] Defendants are actually members of the Diablos Viejos (DV) which is a subset of the Nortenos gang.

(Tr. at 622).

During cross examination, defense counsel questioned Worthey extensively. Worthey admitted that he had provided false information to Dodge City police about the shooting that occurred on June 8, 2009. Worthey admitted to prior criminal acts including burglaries and assaults. Worthey was also questioned about his plea agreement with the government, which was admitted in evidence. Worthey testified that he understood that the judge would make the sentencing decision and that he hoped that his testimony would reduce his sentence. Worthey testified that he had not been promised any particular sentence but that the government had agreed to file a 5(k)(1) motion on his behalf at sentencing.

### Anthony Wright

Wright also testified about the gang, gang signs, tattoos, gang structure, gang meetings and membership in the various Nortenos' gangs. Wright identified Ramirez and Garcia as members of the Diablos Viejos (DV). Wright admitted that he sold drugs and testified that defendants and other gang members also sold drugs. Wright admitted his history of methamphetamine use, past criminal charges and time spent in prison.

On June 8, 2009, Wright was at his trailer in the trailer park in Dodge City. In the early evening, Wright left his trailer and picked up Worthey. They drove around the trailer park and observed a group of people drinking and wearing blue clothing. Wright believed that they were members of the Surenos (Nortenos wear red; Surenos wear blue). Wright and Worthey then drove to Garcia's house. Wright testified that Garcia and Ramirez ran into the house from the alley.

-4-

They all went inside the house and Wright observed Garcia and Ramirez with guns. Wright, Worthey, Garcia and Ramirez then left the house in Wright's car. Garcia and Ramirez kept the guns in their possession. Wright drove to the trailer park and passed by the group of individuals he had observed earlier. Garcia told Wright to park up the street and then they all got out of the car.

Garcia and Ramirez put bandanas on their faces and walked in front of Wright and Worthey. Wright testified that both Garcia and Ramirez had guns when they got out of the car. They walked up behind the group of individuals and someone yelled "Puro Norte." (Tr. at 419). Wright saw both Garcia and Ramirez firing their weapons. Wright then took off running back toward the car and sat in the driver's seat. Garcia and Ramirez were running behind Wright and they climbed into the back seat of the car. Wright drove a "little bit" and then picked up Worthey. Wright testified that Ramirez told Garcia "you got that one." (Tr. at 421). Garcia then told everyone to remember that "you got kids." (Tr. at 422).

During cross examination, Wright testified about his prior arrests for possession of methamphetamine and firearms. Defense counsel also questioned Wright about his plea agreement with the government. Wright testified that he understood that the government was not promising him a sentence but that the government lawyers would file a 5(k)(1) motion on his behalf and recommend a sentence at the low end of the guideline range.

### Joe Galindo

Galindo, a member of the DV but not charged in the case, testified about the night of June 8, 2009. Galindo stated that

-5-

Ramirez called him to come pick up both Ramirez and Garcia. Galindo then drove Ramirez and Garcia to Ramirez' house. They were all in Ramirez' backyard and Galindo asked them what was wrong. Garcia responded that a "scrap" died tonight. (Tr. at 731). "Scrap" is a derogatory term used by Nortenos (DV) to describe Surenos. Galindo testified that Garcia then explained that he shot a Sureno when the Sureno was trying to jump over a fence. Garcia then joked that Ramirez' gun had jammed. Galindo testified that Ramirez stated that his gun had jammed.

### Fabian Neave

Neave testified that he was a Norteno gang member. Neave explained about the gang structure and identified gang members and the gang's involvement in drug trafficking. Neave also testified that on June 8 or 9, 2009, Garcia told him that he (Garcia) shot at Surenos and that Garcia stated that Wright and Worthey told Garcia where to find the Surenos that evening.

### Defendants' Witnesses

At the close of the government's case, both Garcia and Ramirez declined to testify. However, they called witnesses. Garcia called Lisa Austin-Taylor, a psychotherapist, to testify about gangs and their structure. Austin-Taylor testified that the DV gang was a hybrid gang and not a part of the national Nortenos gang. Austin-Taylor did not testify about the events concerning the homicide on June 8, 2009.

Ramirez called Jose Louis Alvarez-Lopez, Detective Bice and Drew Francis. Both Alvarez-Lopez and Bice testified as to the shooting which occurred on October 4, 2008. Drew Francis, an officer with the

Dodge City Police Department, testified as to his interview with April Ortiz-Mendoza, a witness who was called by the government. Francis explained that he positioned his car in the same spot where April allegedly observed Wright's car as it was leaving the trailer park on the night of June 8, 2009. Francis testified that he could only see the driver's seat and the center console from April's position inside the trailer.[4]

### Jury Verdict

The jury was instructed on October 16 and returned guilty verdicts on all counts on October 17.

### B. After the Trial

Ramirez and Garcia were sentenced on January 6, 2014. Ramirez was sentenced to life plus 57 years and Garcia was sentenced to life plus 25 years.

On January 14, 2014, defense counsel read an article in the newspaper which discussed a murder trial in state court. The article stated that Worthey testified in the murder trial. Defense counsel learned that Worthey also testified in a preliminary hearing concerning the murder in June 2013. Worthey's testimony in the state case was not disclosed to defense counsel at any time.

After additional disclosures by the government, defense counsel learned that Worthey met with AUSA Welch, Special Agent Steve Gravatt and Worthey's attorney, Jim Pratt, on March 15, 2013. During the

---

[4] April testified during the government's case that she could see the lower face of the driver, the center console and the lower body of the passenger. April could not identify the driver. April thought the passenger had a gun and that he put it in the center console after getting in the car.

meeting, the following discussion occurred:

> MR. WELCH: So we're good. I expect that the judge is gonna follow our recommendation. All right. So we're looking at 30 and working down from 30. If I was sitting in your shoes, I wouldn't wannabe looking at 30.

> MR. WORTHEY: Yeah.

> MR. WELCH: I understand that. I know you didn't have a gun. I know you didn't shoot anybody. We know that. Okay. This is just where we've got to start.

> * * *

> MR. WELCH: I came over this morning just to cover this, to answer any questions you have, tell you where we are. I'm gonna leave here shortly. There's gonna be a homicide detective from Wichita PO come in and talk to you about this other thing. Okay?

> MR. WORTHEY: Okay.

> MR. WELCH: Now, if you give them information that helps them, leads to new charges, then we're gonna take that into consideration also. It will help you with your recommendation. (Unintelligible.) As we've always said, just be honest, tell 'em what you know; and if it works out, great. Okay.

(Exh. O at 4-6).

Sedgwick County Assistant District Attorney Trinity Muth followed up with AUSA Smith after Worthey's debriefing and informed Smith that the state would file an additional murder charge against Jerone and Shawn Brown. Muth stated that he still wanted to use Worthey in the state case and asked permission to do so. Smith responded in a series of emails, asking questions concerning the filing dates and the time when Worthey's name would need to be revealed in discovery. Muth responded that Worthey's name would have to be in the affidavit by May 8, 2013.

On June 13, 2013, Worthey testified in a preliminary hearing on behalf of the State of Kansas regarding statements he heard about a

murder while he was incarcerated. During his testimony, he was questioned about his agreement with the United States government:

> Q: And is this a plea agreement that you entered into with the U.S. Attorney's office in exchange for testimony in their cases?
>
> A: It is.
>
>             * * *
>
> Q. Now, Mr. Worthey, were you made any additional deals to testify in the State's case, specifically against Jerone Brown?
>
> A. No.
>
> Q. Is it your understanding that the U.S. Attorney's office will file a motion based on your cooperation in all the cases that you're testifying in?
>
> A. Yeah.

(Exh. B at 4-5).

On January 3, 2014, emails were exchanged between AUSA Welch and AUSA Smith regarding the 5(k)(1) motion to be filed on behalf of Worthey. Both Welch and Smith wrote that they forgot about Worthey's testimony in the state case. Smith informed Welch about the testimony and wrote that he had forgotten about the testimony until he had to sign a writ to allow Worthey to testify. Welch responded that he would modify the language in the 5(k)(1) motion to add Worthey's participation in the state case.

On January 6, 2014, the government filed the 5(k)(1) motion on behalf of Worthey. The motion stated that in addition to Worthey's assistance in the trial against Ramirez and Garcia, Worthey provided information to state authorities, testified in the preliminary hearing and was expected to testify during the trial. This court granted the government's motion and sentenced Worthey to ten years.

Defendants now move for a new trial on the basis that the government failed to disclose material evidence and that the government presented false testimony during trial. (Doc. 1005).

## II. Analysis

### A. Standard

The Supreme Court has held that a defendant's due process rights are violated when criminal convictions are obtained by presentation of known false evidence or by suppression of exculpatory or impeaching evidence. Napue v. Illinois, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed.2d 1217 (1959); Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2d 215 (1963). "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." Giglio v. United States, 405 U.S. 150, 153, 92 S. Ct. 763, 31 L. Ed.2d 104 (1972) (internal quotations omitted). "The same result obtains when the [government], although not soliciting false evidence, allows it to go uncorrected when it appears." Douglas v. Workman, 560 F.3d 1156, 1172 (10th Cir. 2009)(citing Napue, 360 U.S. at 269, 79 S. Ct. 1173).

The court must afford defendants a new trial if the suppressed evidence is favorable and material to guilty or punishment. United States v. Reese, ---F.3d---, 2014 WL 1042781 at *6 (10th Cir. Mar. 19, 2014)(citing Smith v. Cain, 132 S. Ct. 627, 630, 181 L. Ed.2d 571 (2012). In order to establish a Brady claim, defendant must prove the following by a preponderance of the evidence: (1) the government suppressed evidence; (2) the evidence was favorable to defendants; and (3) the evidence was material. Id. at *7 (citing United States v. Ford, 550 F.3d 975, 981 (10th Cir. 2008).

## B. False Testimony

"A conviction obtained by the introduction of perjured testimony violates due process if (1) the prosecution knowingly solicited the perjured testimony or (2) the prosecution failed to correct testimony it knew was perjured." United States v. Vaziri, 164 F.3d 556, 563 (10th Cir. 1999)(citing Napue, 360 U.S. at 269); see also Tenth Circuit Pattern Inst. 2.66. Defendants contend that the government "presented" false testimony through Worthey and knowingly failed to correct false testimony with respect to Agent Gravatt and Worthey.

In his second supplemental motion (Doc. 1005), Gonzalez repeatedly uses the words "false" and "perjured" in reference to the testimony of Gravatt and Worthey. Garcia presumably joins in the use of this terminology or at least does not shy away from it. Defendants' claims require close scrutiny, especially in view of the accusation that government counsel "presented" and then failed to call the court's and defense counsel's attention to testimony which they knew to be false. The court does not construe defendants' arguments to be that giving false testimony is some sort of different or less serious variety of perjury. Defendants have simply assumed that the testimony was false without making any effort to analyze the case law regarding what constitutes false testimony/perjury under the relevant statutes, 18 U.S.C. § 1621 and 1623.

In order to prove that a witness committed perjury during a court proceeding, the following must be established: (1) the witness made a declaration under oath before the court; (2) the declaration was false; (3) the witness knew that the declaration was false; and (4) the false declaration was material to the court's inquiry. United

States v. Strohm, 671 F.3d 1173, 1178 (10th Cir. 2011). It goes without saying that proof beyond a reasonable doubt is required. "[P]recise questioning is imperative as a predicate for the offense of perjury." Id. "[N]ear-absolute clarity from the questioner" is required in order to support a perjury charge. Id.; see also Tenth Circuit Pattern Inst. 2.66.

### 1. Steve Gravatt

Agent Gravatt testified about his interviews with witnesses in this case. During cross examination, Agent Gravatt testified as follows:

> Q: Following the Indictment in this case, uhm, you or some officer with the ATF participated with maybe Detective Bice in meeting with -- you've been here all this -- many of the witnesses we've seen?
>
> A. Yes.
>
> Q. Were any of those meetings recorded?
>
> A. No.

(Exh. M at 21-22).

Defendants contend that this testimony was false because Gravatt was present at the March 15, 2013 meeting, which was recorded. Defendants further assert that AUSA Welch knew that this testimony was false because Welch was also present at the meeting. Agent Gravatt's testimony, however, has not been shown to be false. Counsel's question was not succinct or directed to any particular meeting. The question generally asked about Gravatt's meetings with witnesses and Detective Bice. Agent Gravatt understood the question as asking about the proffer meetings which occurred with Detective Bice and truthfully answered that they were not recorded. (Govt. hearing exh. 4).

-12-

Therefore, defendants have not established that Agent Gravatt testified falsely.

## 2. Russell Worthey

Defendants' claims regarding Worthey focus on the March 15, 2013 meeting which Worthey did not identify during his testimony. Defendants contend that the government knowingly failed to correct false testimony after Worthey stated that he met with the government on four or five occasions, but failed to disclose the March 15, 2013 meeting. Defendants further claim that Worthey presented false testimony concerning his plea agreement because he did not disclose the non-specific sentencing recommendation made by Welch during the March 15, 2013 meeting. The government responds that it did not knowingly fail to correct the testimony but rather "had no recollection of the March 15, 2013, meeting during Worthey's testimony." (Doc. 1018 at 4).

Worthey's testimony spans 145 pages of trial transcript, one-third of which was cross-examination. The colloquy about meetings which defendants claim constituted perjury consumes less than two pages at the very end of Worthey's testimony. Worthey testified that he met with "the government" on three occasions. He could not recall when they were. When asked specific dates, Worthey admitted to three: May 22, August 8 and December 17, all in 2012. He did not recall a meeting on June 14, 2012. Finally, he acknowledged meeting with AUSA Welch "like three weeks ago." So, Worthey ended up truthfully acknowledging four meetings and he was unable to recall one meeting. Defense counsel did not define "government," ask what occurred at any of the meetings, who was present, nor did he ask if Worthey was

certain that there were no other meetings.  But there <u>were</u> other meetings.  Worthey testified on direct examination about a meeting he had with a Dodge City detective in June 2009.  (Tr. at 88-89).  Garcia's counsel identified June 17, 2009 when Worthey was questioned by Detective George and Worthey admitted that he was.  (Tr. at 101).  Thus, when asked about specific dates, Worthey told the truth.  There is no evidence that Worthey recalled the March 15, 2013 meeting and intentionally failed to mention it.  The court finds that Worthey's failure to volunteer that there was a March 15, 2013 meeting does not constitute knowing false testimony or perjury.  No reasonable jury following the elements, <u>supra</u>, could convict Worthey of perjury based on what occurred at the trial.

To the extent that the March 15, 2013 meeting involved a sentencing recommendation, Worthey was questioned extensively on direct examination and then on cross-examination by Garcia's counsel regarding his understanding about the agreement.  His plea agreement was received in evidence.  (Tr. at 89-92; 114 and 120-131).  There is no claim that Worthey gave untruthful answers to the questions asked.[5] He was never asked if there was any other agreement with the government.  The court is similarly satisfied that a reasonable jury could not find the elements required for a perjury conviction based on Worthey's failure to volunteer information about the agreement as

_____

[5] Ramirez' counsel apparently believes that Worthey was untruthful when he testified that he faced a sentence of "natural life" on the § 924(c) count because he did not mention AUSA Welch's statement during the March 15, 2013 meeting about "working down from 30 years."  In the same breath, counsel concedes that Worthey's testimony was "technically correct." (Doc. 1005 at 12).  Counsel does not explain how "technically correct" testimony can constitute perjury.

-14-

it pertained to the state case.

These findings do not excuse the government's failure to timely disclose the March 15, 2013 meeting. They are simply findings that there is no evidence that the government intentionally presented or failed to correct false or perjured testimony.[6]

### 3. Conclusion

Defendants' motion for a new trial on the basis that the government "presented" perjured testimony, or failed to correct testimony that it knew to be perjured, is denied.

### C. **Brady/Giglio** Violation

Defendants contend that the government violated their due process rights by failing to disclose Worthey's participation in the state court trial and failing to disclose its agreement to seek a sentence reduction as a result of Worthey's testimony in the state court trial.[7] As noted above, a defendant seeking a new trial on Brady grounds must show that "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence

---

[6] During the hearing, AUSA Welch spoke to the court and admitted to his failure to disclose the existence of the meeting to defense counsel. Welch stated that he did not recall the meeting during Worthey's testimony and simply forgot about Worthey's testimony in the state court proceeding. The court believes and accepts Welch's statements. The court has worked with AUSA Welch for more than twenty years and has never had an occasion to doubt his integrity. The court would say the same thing about AFPD Henry should his credibility or integrity be questioned.

[7] In Ramirez' final pleading, he asserts that the government violated Brady because of a late disclosure concerning Mariett Gonzalez. (Doc. 1005 at 31). The late disclosure of the evidence during trial did not violate Brady because the disclosure came prior to Gonzalez' testimony and defense counsel were able to make use of the evidence. United States v. Scarborough, 128 F.3d 1373, 1375-76 (10th Cir. 1997).

was material." United States v. Smith, 534 F.3d 1211, 1222 (10th Cir. 2008). The government concedes that the first two elements have been met in this case. (Doc. 1018 at 1-2). The government contends that the suppressed evidence was not material because it was cumulative impeachment evidence and that substantial evidence concerning the crimes was testified to by other witnesses.

> Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. A reasonable probability means the likelihood of a different result is great enough to undermine confidence in the outcome. Put another way, we ask whether the absence of the withheld evidence at trial "shakes our confidence in the guilty verdict." United States v. Cooper, 654 F.3d 1104, 1120 (10th Cir. 2011). We determine materiality after reviewing the record as a whole.

> One observation on materiality: The test generally doesn't fluctuate with the government's culpability. Defendants believe that it does and suggest there's an inverse relationship between the two: the greater the government's culpability, the lesser the defendant's burden on materiality. That suggestion, however, runs afoul of our caselaw. It also runs afoul of Brady's purpose, which is not to punish the misdeeds of the prosecutor, but to avoid an unfair trial.

Reese, 2014 WL 1042781, *6-7 (internal citations and quotations omitted).

### 1. Cumulative Impeachment

The Tenth Circuit has held that when the credibility of a witness "has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a Brady claim." United States v. Cooper, 654 F.3d 1104, 1120 (10th Cir. 2011). The evidence is not material when undisclosed impeachment evidence is cumulative of bias already presented and only provides

marginal additional support.  Id. (citing Douglas v. Workman, 560 F.3d 1156, 1174 (10th Cir. 2009).

Defendants assert that evidence of the state cooperation would have opened up new grounds for impeachment because defendant would have challenged the accuracy of Worthey's state court testimony, shown Worthey's close relationship with the government and revealed AUSA Welch's statements during the March 15, 2013 meeting.

Defendants, however, have failed to identify how they would have "scrutinized" the accuracy of Worthey's state court testimony.  (Doc. 1005 at 25).  Defendants have the transcript of Worthey's preliminary hearing testimony in their possession and have had it for some time. Defendants have failed to identify relevant evidence in the transcript that would have been admissible during trial and opened up new grounds for impeachment.

Defendants further contend that the suppressed evidence demonstrates Worthey's "close relationship with government officials." (Id.)  In their most recent brief, defendants cite to Douglas v. Workman, 560 F.3d 1156 (10th Cir. 2009), in support of their position that the suppressed evidence regarding the deal with the government violated their due process rights.  In Douglas, the Tenth Circuit found a due process violation when the government failed to disclose a deal with the key witness.  The witness in Douglas was questioned about his motive for testifying but he denied the existence of a deal. The Tenth Circuit held that the suppressed evidence violated the defendant's due process rights because it foreclosed an avenue of

impeachment that could not be explored on cross examination.[8]

Worthey, however, was extensively questioned about his relationship with the government officials in this case, what he understood the government was willing to do on his behalf at sentencing and his motive for testifying. Although the full nature of the deal was not revealed to the defense, the jury had knowledge that Worthey was testifying in order to receive a benefit of a reduced sentence. The suppressed evidence would have shown that Worthey might[9] receive additional credit for his testimony in a state proceeding. The suppressed evidence would not, however, open up a <u>new</u> avenue of cross-examination. <u>Cooper</u>, 654 F.3d at 1120.

Defendants also cite to <u>Browning v. Trammell</u>, 717 F.3d 1092 (10th Cir. 2013) and <u>DeMarco v. United States</u>, 415 U.S. 449 (1974). In <u>Browning</u>, the trial court denied the defendant's motion to compel psychiatric records of the only eyewitness to the crime. The records were "disturbing" and stated that the witness displayed "magical thinking" and a "blurring of reality and fantasy." 717 F.3d at 1095. The Tenth Circuit held that the records were material because they were the only avenue to impeach the witness' testimony and support the defendant's defense that the witness was a participant in the crime.

The facts in <u>Browning</u> do not support defendants' position. As

---

[8] The witness in <u>Workman</u> was also the only eye witness to the crime and therefore, the Circuit held that there was a reasonable probability that the result of the trial would have been different. Unlike <u>Workman</u>, Worthey was not the only witness to the crimes in this case. <u>See</u> <u>infra</u>.

[9] Worthey acknowledged that the final sentence was still up to the court. The suppressed "deal" did not include an agreement to plead to a lesser count but only that the government would include the cooperation in its request for a reduced sentence to the court.

previously discussed, defendants attacked Worthey's credibility on the basis that he had a motive to testify. The suppressed evidence did not provide a <u>new</u> avenue for impeachment. Moreover, as discussed <u>infra</u>, there was testimony from Wright and other witnesses that was strong enough to sustain confidence in the verdict. <u>Browning</u>, 717 F.3d at 1106.

Defendants cite <u>DeMarco</u>, 415 U.S. 449, for the proposition that the "Supreme Court held reversal is required under circumstances very similar to [defendants'] case." (Doc. 1005 at 28). In <u>DeMarco</u>, the witness testified that the government made him no promises. However, there was a question as to whether there was a promise made to the witness. The Supreme Court remanded the case to the district court for an evidentiary hearing. The opinion gives no insight as to the evidence presented at trial, the scope of cross examination or whether there were other witnesses to the crime. Therefore, the court does not find that the circumstances in <u>DeMarco</u> are similar to this case, much less "very similar."

Finally, defendants argue that the March 15, 2013 meeting provides evidence that the government discussed a particular sentence with Worthey. As discussed above, AUSA Welch's statements during the interview about "work[ing] down from 30" were conditioned on his statements that "it's the judge's decision in the end." (Exh. O at 3-4). Welch did not promise Worthey a particular sentence.

Defendants have failed to establish that the suppressed evidence was anything more than cumulative impeachment evidence. The jury was well aware of defendant's "motive for testifying." <u>Cooper</u>, 654 F.3d at 1122. The suppressed evidence, because it would have added little

to the jury's view of Worthey, could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles v. Whitley</u>, 514 U.S. 419, 435, 115 S. Ct. 1555 (1995).

### 2. Reasonable Probability of the Outcome

In determining whether suppressed evidence is material, the court must ask whether the "absence of the withheld evidence at trial shakes [the court's] confidence in the guilty verdict." <u>Reese</u>, 2014 WL 1042781, *7 (citing <u>Cooper</u>, 654 F.3d at 1120). "Evidence impeaching a government witness may not be material if the government's other evidence is strong enough to sustain confidence in the verdict." <u>Id.</u> (citing <u>Smith</u>, 132 S. Ct. at 630).

In this case, there were two witnesses to the homicide on the evening of June 8, 2009, Worthey and Wright. Defendants attempt to categorize Worthey as <u>the</u> critical and indispensable witness in this case. A review of the transcript, however, does not support defendants' position. Wright testified that he saw <u>both</u> defendants with guns on the night of the murder. Wright testified that he observed <u>both</u> defendants shooting those guns at the victims. Worthey did not see Garcia with a gun and did not observe either defendant shooting guns. In addition, Worthey's testimony as to the sequence of events on June 8 was corroborated by the testimony of Wright. Both witnesses also testified as to statements made by defendants after the shooting.

Defendants further argue that the only other person who could implicate defendants in the homicide was Wright and that Wright's credibility was damaged during trial. First, defendants'

characterization that Wright and Worthey were the only witnesses who could implicate them in the murder is incorrect. Both Galindo and Neave testified as to the homicide. Galindo, who had no apparent motive to lie, testified that Garcia admitted shooting a Sureno and Ramirez stated that his gun jammed during the shooting. Neave also testified that Garcia told him that he shot someone on June 8. Therefore, there were other witnesses who testified about the homicide and defendants' own statements implicated themselves in the homicide.

Second, defendants' suggestion that the jury would not credit Wright's testimony is not supported by the record. Wright was questioned extensively as to his criminal history, gang involvement, plea agreement, and lack of candor with police. (Worthey was questioned on the same issues. Among other things which the jury could consider in judging his credibility, admitted that he lied to the police on several occasions.) In fact, the majority of the non-law enforcement witnesses in this case were gang members and had criminal histories. Therefore, although Wright's credibility was rightfully questioned at trial, the court has no basis to find that the jury simply disregarded Wright's entire testimony in its deliberations.

Defendants also suggest that Wright was not an effective witness because he "mumbled, slouched and proved otherwise evasive." (Doc. 1005 at 25). Defendants fail to identify how Wright was evasive during questioning and a review of the record does not support such a finding. Moreover, in closing argument, defense counsel did not argue that Wright was a terrible or evasive witness and instead grouped Wright and Worthey together in an attack on their motives to

testify and their involvement in the shooting.

Finally, and perhaps most important, defendants' counsels' opinions regarding Wright's demeanor during his testimony, and whether it did or did not affect his credibility, are <u>totally</u> irrelevant.  In a case tried to a jury, a witness' credibility is exclusively reserved to the jury.  No judge, including the undersigned, and certainly no judge reviewing a cold transcript, can opine whether the jury found a witness to be, or not to be, credible.

A review of the evidence in this case demonstrates that although Worthey was an important witness, he was by no means the only witness.  Wright, Galindo and Neave all testified that defendants were involved in the homicide on the evening of June 8, 2009.  Therefore, the court finds that there is not a reasonable probability that the outcome of defendants' trial would have been different had the government disclosed Worthey's participation in the state case and the government's agreement concerning the same.  <u>See    Reese</u>, 2014 WL 1042781, *14; <u>United States v. Agurs</u>, 427 U.S. 97, 112-113 (1976)("If there is no reasonable doubt about guilt whether or not the additional evince is considered, there is no justification for a new trial.")  No reasonable doubt has been shown to exist.

## III.   Conclusion[10]

[10] In a final footnote, Ramirez' counsel asserts that ". . . this case is not the first time the Department of Justice has failed to meet its obligations under <u>Brady</u> and <u>Giglio</u>."  (Doc. 1005 at 32, n. 13).  Counsel relies heavily on a dissenting opinion in <u>United States v. Olsen</u>, 737 F.3d 625 (9th Cir. 2013), which asserts that <u>Brady</u> violations have reached "epidemic proportions in recent years."  The dissenting opinion cites one Supreme Court decision, 16 federal cases (some of which, like <u>Douglas v. Workman</u>, are federal habeas cases) and 14 state court decisions.  No cases are cited from the District of Kansas.  Far be it for a mere federal district judge to question a

Defendants Gonzalo Ramirez' and Pedro Garcia's motions for a new trial[11] are denied.[12]  (Docs. 912, 914, 938, 1005).

A copy of this Memorandum and Order shall be forwarded to the Tenth Circuit.

IT IS SO ORDERED.

Dated this ___9th___ day of April 2014, at Wichita, Kansas.


s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE

---

circuit judge's view that 31 cases constitute an "epidemic."
Nonetheless, in the 22-plus years the undersigned has served as a district judge, he has encountered only one instance of a <u>Brady</u> violation and that occurred in a case being handled by counsel out of the Department of Justice in Washington.  No AUSA from Kansas was involved.

The court understands and expects aggressive advocacy by the federal public defender's staff.  But there is a big difference between aggressive advocacy and unfair accusations.  AUSAs in Wichita are not responsible for the actions of AUSAs in other districts and other cases any more than Wichita AFPDs are responsible for the mistakes of AFPDs in other districts.

[11] At various points, defendants have sought outright dismissal of the charges as an alternative to a new trial.  Obviously, dismissal is not an appropriate remedy.

[12] Defendants filed two motions for production concerning the disclosure of certain materials.  The government's responses to the motions indicate that the government provided all materials it had to defendants.  Therefore, the motions are denied as moot.  (Docs. 939, 1007).

-23-